# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CRIMINAL CASE NO. |
| | : | 3:19-cr-215 (JCH) |
| | : | |
| v. | : | |
| | : | |
| KEVIN E. CREED, | : | |
| Defendant. | : | NOVEMBER 15, 2019 |
| | : | |

## RULING AND ORDER

In August 2019, Kevin Creed was charged, by information, with one count of wire fraud in violation of section 1343 of title 18 of the United States Code.  Information (Doc. No. 1).  The Information alleged that, between 2010 and 2018, Creed operated Friends of Fisher House Connecticut, Inc. ("Fisher House Connecticut") purportedly as a charitable organization; solicited donations to that organization through direct person-to-person solicitation, online media, and fundraisers by falsely representing to would-be donors that the funds raised would be used to benefit veterans and their families; and then spent the money Fisher House Connecticut earned through donations to pay for his personal expenses. Id. at 3-5.

At Creed's Initial Appearance, the Magistrate Judge correctly noted that it was not clear that all the victims of Creed's crime had been notified of the proposed plea agreement, as required by the Crime Victims' Rights Act, 18 U.S.C. § 3771.  See Transcript, Initial Appearance (Doc. No. 16) at 13-14.  The Magistrate Judge recommended that this court withhold approval of the plea agreement to ensure that the requirements of the Crime Victims' Rights Act had been met and, if necessary, to allow notice through the alternative notice provisions of that statute.  Id. at 14.  The

undersigned ordered briefing on the issue of which individuals and entities should be considered "victims" under section 3771 of title 18 of the United States Code and held a hearing on that issue on October 29, 2019.[1]  Having considered the parties' submissions and representations at that hearing, the court issues this Ruling and Order to define which categories of individual and organizational donors are "victims" of Creed's fraud and to establish a schedule of briefing and notice to ensure that the victims' rights are respected.

## I.    ALLEGATIONS IN THE INFORMATION

As alleged in the Information, in or about 2010, Kevin Creed established Friends of Fisher House Connecticut, Inc. ("Fisher House Connecticut") as a not-for-profit organization.  Information ¶ 4.  Creed created the impression that Fisher House Connecticut was affiliated with the Fisher House Foundation, Inc. ("Fisher House National"), a national not-for-profit charitable organization that builds and operates a series of houses near United States military hospitals and Veterans Affairs facilities.  Id. ¶ 2.  Creed then began soliciting donations to Fisher House Connecticut, representing to would-be donors that he would use the funds that Fisher House Connecticut raised from donations to build Fisher Houses and make grants to Fisher House National.  Id. ¶ 5.

---

[1] Both parties' briefs discussed both section 3771 and the definition of "victim" under section 2B1.1 of the Federal Sentencing Guidelines; in fact, both submissions included longer discussions of the definition under the Guidelines than under the Crime Victims' Rights Act.  See Defendant's Memorandum (Doc. No. 23); Government's Memorandum in Aid of Sentencing (Doc. No. 24).  However, the issue of "victims" under the Guidelines, or even which victims are entitled to restitution under the Mandatory Victims' Restitution Act, is not before the court at this stage of the proceedings.  The court will focus its discussion here on the definition of "victim" under the Crime Victims' Rights Act.

However, beginning in approximately 2012 and continuing until about December 2018, Creed used Fisher House Connecticut to orchestrate a scheme to defraud individuals and organizations and divert the money they donated to Fisher House Connecticut for his personal use. The scheme was that Creed would falsely represent to individuals and organizations that their donations to Fisher House Connecticut would be used to support veterans. Id. ¶¶ 6-7. After obtaining the donations, Creed spent a significant portion of the funds raised on his personal expenses. Id.

Creed's scheme relied on false representations to solicit donations, and he solicited those donations in various ways. First, Creed solicited donations through person-to-person contact by falsely representing to individual and organizational would-be donors any funds they donated would be used only to support the mission of Fisher House. Id. ¶¶ 5, 8. For example, Creed had a personal conversation with the owner of several ShopRite grocery stores in Connecticut and induced him to hold several fundraising drives for Fisher House Connecticut by falsely representing to the owner that Creed was "raising money to construct a Fisher House in West Haven, Connecticut." See Government's Memorandum in Aid of Sentencing ("Gov'ts Mem. on Victims") (Doc. No. 24), Att. B, at 1-2. In addition, Creed insinuated to the owner of ShopRite that he was not taking any sort of compensation for the work he was doing for Fisher House Connecticut. Id. In 2017, the ShopRite stores donated $92,229 to Fisher House Connecticut. Information ¶ 15. Creed deposited that money to the Fisher House Connecticut bank account, id. ¶ 15, from which he ultimately withdrew $1.4 million dollars for his personal use, id. ¶ 14.

It was further part of Creed's scheme to defraud individuals and entities into making donations that Creed created a website for Fisher House Connecticut, on which Creed falsely represented that funds would be used for the benefit of Fisher House.  Id. ¶ 11.  Either through person-to-person conversations or the Fisher House Connecticut website, Creed was able to solicit donations from organizations including Wakefern, the Westbrook Elks, the Wallingford Lions club, the Fred Astaire Dance Studio, various American Legions, the Sons and Daughters of Italy, and APK Charities, a family-run non-profit corporation that donated a portion of the proceeds from its annual 5K race to Creed's organization, as a result of Creed's representations.  See Govt's Mem. on Victims, Att. B; id., Att. C; id., Att. D.

In addition, Creed's scheme to defraud involved having one of the paralegals who worked at Creed's law firm raise money on behalf of Fisher House Connecticut by soliciting donations and planning fundraising events, such as a half-marathon race, for Fisher House Connecticut.  Gov'ts Mem. on Victims, Att. D, at 2; Plea Agreement at 11. The paralegal was acting on Creed's behalf and at his direction.  Id.  Other fundraising events were also part of the scheme to defraud individuals by falsely representing that their money would be used to help veterans.  For example, Creed collected money by "selling bricks to people and promising to put their names on them," but "the bricks never happened."  Id. at 3.  In addition, Fisher House Connecticut, under Creed's direction, set up a tent and put a jar out at a garlic festival in Connecticut.  Id. at 4. Although the paralegal was told that the jar raised approximately $3,000, Creed said that it only made $1,000 and claimed to have deposited the proceeds himself.  Id.  The paralegal stated that she believed Creed stole at least part of the money.  Id.  Finally, it

4

was also part of the scheme to defraud to make false representations to the IRS, including false representations that certain individuals were on the Board of Directors of Fisher House CT, Information ¶ 9, and that two grants had been made to Fisher House National, id. ¶ 10.

Thus, as the Information alleges, Creed devised a scheme to defraud individuals and obtain money by making fraudulent representations and used interstate wires to execute that scheme.  Creed falsely represented that any donation made to Fisher House Connecticut would support veterans, when, in reality, a significant portion of those donations went into Creed's pocket.  The scheme relied on numerous forms of contact: person-to-person solicitation, web media, and events planned by Fisher House Connecticut.  Creed did not inform any of the donors, Fisher House Connecticut, or Fisher House National that he was using a significant portion of the donations to pay for his personal expenses.  Id. ¶ 13.  Over the course of the fraudulent scheme, Creed solicited over $2.5 million in donations by making false representations to individual and organizational donors.  Id. ¶ 14.  Creed obtained money through the scheme by using approximately $1.4 million dollars of the money donated to Fisher House Connecticut for his personal expenses.  Id. ¶ 12, 14.

The United States Attorney charged Creed with one count, wire fraud, in violation of 18 U.S.C. § 1343 (Count One).  Id.

II.    **DISCUSSION**

A.    Legal background

The Crime Victims' Rights Act of 2004 ("CVRA"), 18 U.S.C. § 3771, guarantees to victims of federal crimes several substantive and participatory rights.  These rights

5

include the right to be "informed in a timely manner of any plea bargain or deferred prosecution agreement," the "reasonable right to confer with the attorney for the Government in the case," and "the right to be reasonably heard at any public proceeding in the district court involving release, plea, sentencing, or any parole proceeding."  18 U.S.C. § 3771(a); see also United States v. Stevens, 239 F. Supp. 3d 417 (D. Conn. 2017) (rejecting plea agreement where victim had not been given the opportunity to discuss plea agreement with government counsel).[2]

Whether the individuals and organizations who donated to Fisher House Connecticut are "victims" under these statutes is a key question for this court.  If they are victims, of course, they are entitled to the rights discussed above and, in the future, may be entitled to restitution.  Further, if the court finds that these rights have not been respected, it may, as the court in Stevens did, reject the plea agreement that Creed has reached with the government.  Stevens, 239 F. Supp. 3d at 425.

Under the CVRA, a "victim" is "a person directly and proximately harmed as a result of the commission of a Federal offense or an offense in the District of Columbia." 18 U.S.C. § 3771.[3]  This definition encompasses two requirements.  A person must be

---

[2] In addition to the rights protected by the CVRA, victims, in certain cases, are entitled to restitution under the Mandatory Victims Restitution Act, 18 U.S.C. § 3663A, or the Victim and Witness Protection Act, 18 U.S.C. § 3663.

[3] This language is nearly identical to the definition of "victim" in the Mandatory Victim Restitution Act (MVRA) and the Victim and Witness Protection Act, which define a "victim" as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C.A. § 3663A; 18 U.S.C. § 3663(a)(2);  see also In re Local 46 Metallic Lathers Union and Reinforcing Iron Workers and Its Associated Benefit and Other Funds, 568 F.3d 81, 84 (2d Cir. 2009) (describing "the definitions of 'victim' under both the CVRA and MVRA" as "coterminous").

"directly and proximately harmed." Id. Further, the person must be harmed "as a result of the commission of a Federal offense." Id. The court discusses each in turn.

First, a victim must be "directly and proximately harmed." Id. This causation requirement encompasses traditional notions of "but-for" causation. See In re Rendon Galvis, 564 F.3d 170, 175 (2d Cir. 2009). For example, in United States v. Marino, 654 F.3d 310 (2d Cir. 2011), the defendant took a job with the Bayou Hedge Fund Group, a large Ponzi scheme masked as an investment fund. Marino performed various administrative tasks that supported the Ponzi scheme, including by maintaining the appearance that the hedge fund was being audited by an accounting firm, when, in reality, both the accounting firm and its audit reports were fictious. Marino, 654 F.3d at 312-13. Marino argued that the victims' losses were caused by the hedge fund and not by his actions in covering up the Ponzi scheme by creating the appearance that the accounting firm was real. The Second Circuit rejected this argument. The Second Circuit concluded that the appellant's actions were the proximate cause of the victims' losses because Marino's crime—misprision of felony—was a "cause in fact—a 'but for' cause—of the investors' losses." Marino, 654 F.3d at 322. Had Marino not concealed the Ponzi scheme, the court reasoned, no investor would have invested in it. Id. Since Marino, the Second Circuit has found direct and proximate cause where the offense conduct was the "but for cause of the victims' losses" or where the losses were "entirely foreseeable." See, e.g., United States v. Schwamborn, 542 F. App'x 87, 89 (2d Cir. 2013) (inflating the price of inherently worthless shares was the but for cause of victim's lost investments). Of course, in other cases, "direct[ ] and proximate[ ]" causation is quite clear, because the defendant's actions are the immediate cause of the victim's

7

harm.  See United States v. Hall, 467 Fed. App'x. 47 (2d Cir. 2012) (concluding that the defendant's false representation that, for a fee, she would allow clients to "lease" money to prove their creditworthiness was the direct cause of the victim's loss of the money they gave her as "fees"); Jordan v. Dep't of Justice, 173 F. Supp. 3d 44, 50 (S.D.N.Y. 2016) (concluding that an individual whose husband used documents forged with her signature  to initiate wire transfers from her accounts was a "victim" of financial fraud).

In addition, a victim must be "directly and proximately" harmed "as a result of the commission of a[n] . . . offense."  18 U.S.C. § 3771; see also 18 U.S.C. § 3663(a)(2); 18 U.S.C.A. § 3663A.  In other words, there must be a nexus ("as a result") between the victim's loss and the conduct that constituted the charged offense.  The Second Circuit discussed this nexus requirement in In re Local 46 Metallic Lathers Union and Reinforcing Iron Workers and Its Associated Benefit and Other Funds, 568 F.3d 81 (2d Cir. 2009).[4]  In Local 46, the defendant developed a scheme in which he issued checks to fictitious vendors, endorsed those checks, cashed them, and then paid his employees in cash.  As a result, the employees avoided paying union dues.  Local 46, 568 F.3d at 82.  Local 46 sought restitution and argued that the "whole raison d'etre" of the conspiracy was to pay employees in cash.  However, the Magistrate Judge and District Judge concluded that the Local was not a victim of the conspiracy to launder money because "the crime of laundering money[ ] had already been committed by the time the cash was given to the union workers."  Id. at 87.  The Second Circuit agreed: a victim is

---

[4] Although Local 42 focused on the text of the Mandatory Restitution Act, the Court noted that "the definitions of 'victim' under both the CVRA and the MVRA are coterminous."  Id. at 84.

any person directly harmed by the criminal conduct in the course of a scheme or conspiracy, and the "reference point to which such a conspiracy is tied" is the "offense of which the defendant has been convicted."  Id.  Because the defendant pleaded guilty to conspiracy to engage in money laundering, what he planned to do with the funds once he got them was not relevant.  Id.  Thus, Local 46 stands for the proposition that the conduct that causes the harm must be an element of the offense to be considered as a basis for determining compensable harm.  Id.; see also United States v. Archer, 671 F.3d 149 (2d Cir. 2011) (concluding, under the MVRA, that, although the charged offense—visa fraud—was "complete" when the fraudulent visas were presented to the government, individuals who had paid for the fraudulent visa applications could be "victims" eligible for restitution if they had not known about the fraudulent nature of the applications because their payments "were the mechanism through which Archer profited from his conspiracy, and thus, were an integral part of the single scheme he devised.")

Where, as in Local 46, the link between the charged offense and the harm is too attenuated, the harmed individual is not a "victim" under the CVRA.  Thus, for example, the mother of an individual who had been murdered in connection with a Colombian drug operation was not a "victim" of narcotics trafficking.  In re Rendon Galvis, 564 F.3d 170 (2d Cir. 2009).  In Rendon Galvis, the Second Circuit concluded that there was not a sufficient "nexus" between the murder and the trafficking and, therefore, the mother was not entitled to exercise rights under the CVRA.  Id.  Similarly, in Jordan v. Dep't of Justice, 173 F. Supp. 3d 44, 56 (S.D.N.Y. 2016), the court concluded that a wife whose husband had fraudulently transferred money from her bank accounts was a "victim" of

9

the financial fraud he committed against her, but not a "victim" of his attempts to use her

money to perpetuate several healthcare frauds. Id. at 56. In the court's view, the

healthcare frauds "did not <u>cause</u> the 'financial pillaging' that directly and proximately

harmed her." Id. at 56. And, in <u>United States v. Sharp</u>, 463 F.Supp.2d 556, 566 (E.D.

Va. 2006), the Eastern District of Virginia concluded that a woman who had been

abused by her partner was not a "victim" of her partner's drug dealer, because the

causal connection between the narcotics distribution with which the defendant was

charged was too attenuated from the physical violence the putative victim suffered.

In summary, in order to qualify as a "victim" under the CVRA, an individual must

have been "directly and proximately harmed" as a result of conduct that is an element of

the offense of conviction. See <u>Local 46</u>, 568 F.3d at 87. "[D]irectly and proximately"

includes the concept of "but-for" causation, <u>Rendon Galvis</u>, 564 F.3d at 175; therefore, a

victim is a person who would not have been harmed but for the actions that constitute

an element of the offense.

B.    The parties' positions

Creed takes the position that only Fisher House is a victim. See Plea Agreement

at 5 ("The defendant . . . asserts that the charity was the sole victim.") In his

Memorandum on the question of crime victims under the CVRA ("Def.'s Mem.") (Doc.

No. 23), Creed argues that individuals or entities who have not suffered a "substantial

financial hardship" are not "victims" under section 2B1.1 of the Sentencing Guidelines.

Def.'s Mem. at 6.

The government argues that "the victims in this case include the individuals,

entities, and Friends of Fisher House Connecticut, all of whom were defrauded out of

money and property." Government's Memorandum in Aid of Sentencing ("Gov'ts Mem. on Victims") (Doc. No. 24), at 1. The government refers to the "victim donors" throughout its Memorandum. Although it does not define "victim-donor," the government gives several examples of individuals it considers "victim-donors," including the operators of APK Charities, the Knights of Columbus, a dance studio, and the owner of ShopRite stores that donated to Creed. Gov'ts Mem. on Victims at 8-9. The government argues that the definition of victim under the CVRA and the MVRA is "to be construed broadly." Id. at 12. In its view, "the victim-donors who gave money to Creed are victims in this case," because "they would not have given Creed their money if they knew the true facts," "Creed[']s lies . . . were the direct and proximate cause of the losses," and the "individuals and entities such as ShopRite or the local American Legion Posts" would not have "donated to Creed . . . if they had been informed of his fraudulent plan." Id. at 13-15.[5]

In addition, the government has filed a supplemental memorandum, arguing that Fisher House Connecticut was effectively a "sham" organization, in response to a question posed by the court. See Government's Supplemental Memorandum as to Victims (Doc. No. 36). Relying on United States v. Gonzalez, 647 F.3d 41 (2d Cir.

---

[5] Further, the government argues that the individuals are victims, for the purposes of the MVRA, because they have suffered a pecuniary loss. Govt's Mem. on Victims at 14. The government also argues that the victim-donors should be considered "victims" under section 2B1.1 of the Sentencing Guidelines. Id. at 15-20. At this juncture, the court does not discuss restitution under the MVRA or the definition of "victim" under the Sentencing Guidelines.

2011), the government argues that Fisher House Connecticut was a "sham entity" and therefore, that all the individuals who donated to it should be considered victims.[6]

### C.   Application

As noted above, the key question before the court is what categories of people and entities affected by Creed's crimes should be considered "victims" under the Crime Victims Rights Act, 18 U.S.C. § 3771.  As discussed, in order to be considered a victim, an individual or entity must have been "directly and proximately harmed" as a result of Creed's offense.  See Local 46, 568 F.3d at 87; Rendon Galvis, 564 F.3d at 175.

As discussed, the Information charges Creed with one count, Wire Fraud, in violation of 18 U.S.C. § 1343 (Count One).  The elements of wire fraud are that (1) there was "a scheme or artifice to defraud, or for obtaining money or property by false or fraudulent pretenses, representations or promises;" (2) the defendant "devis[ed] or intend[ed] to devise" the scheme, with knowledge of its fraudulent nature and specific intent to defraud; and (3) that the defendant used or caused the use of interstate wires to execute the scheme.  18 U.S.C. § 1343; Plea Agreement at 1.  As discussed supra in section I, Creed devised and implemented a scheme to defraud individuals by falsely representing that any donation they made to Fisher House Connecticut would support veterans, when in reality a significant portion of those donations went into Creed's pocket.  Information ¶¶ 13-15. The scheme relied on numerous forms of contact: person-to-person solicitation, web media, and events like the Fisher House Connecticut

---

[6] The Gonzalez case focused on the application of the Sentencing Guidelines and restitution; therefore, the court does not discuss it in its analysis below.

5K run.  Information ¶¶ 5-13.  Having devised the scheme, Creed used its proceeds to pay his personal expenses.  Id. ¶¶ 13-15.  He did so by taking funds from the Fisher House Connecticut bank account for his personal use.  Id.

In the court's view, the putative victims in this case fall into four categories.  First, the court will discuss Fisher House Connecticut, from which Creed took approximately $1.4 million.

The second category of putative victims is those individuals who were induced to donate to Fisher House Connecticut by Creed's false representations about the purpose of their donations, through either direct personal solicitation, his Fisher House Connecticut website, or events planned by Creed's organization at his direction.  This category includes individual and organizational donors from whom Creed or his agents solicited donations, including the Garafalo ShopRite, Wakefern, the Westbrook Elks, the Wallingford Lions club, the Fred Astaire Dance Studio, various American Legions, the Sons and Daughters of Italy, and APK Charities.  See Govt's Mem. on Victims, Att. B; id., Att. C; id., Att. D.  It also includes individuals who participated in events planned by Creed or his agents, including participants who participated in the races coordinated by Creed's paralegal as fundraisers for Fisher House Connecticut or donors who put money in the jar at the tent Fisher House Connecticut set up at the garlic festival in Connecticut.  At each of those events, Creed falsely represented, through Fisher House Connecticut, that all donations would be used to support veterans.  Gov'ts Mem. on Victims, Att. D, at 2-4.

The third category of putative victims includes those individuals who donated to participate in events hosted by others, where the donations were ultimately collected by

an intermediary and given to Fisher House Connecticut.  This includes, for example, individuals who donated money to run the 5K race that APK Charities coordinated. Govt's Mem. on Victims, Att. C.  It also includes individual shoppers who donated money at ShopRite, which ShopRite then turned over to Creed.  Gov'ts Mem. on Victims, Att. B.

The final category of putative victims is the "would-be beneficiaries" of the donations made to Fisher House Connecticut, such as Fisher House National and the veterans who could have benefited from the donations made to Fisher House Connecticut, had Creed not taken the money for his personal use.

For each category, the court considers whether the person was harmed as a result of conduct that is an element of the offense of conviction.  See Local 46, 568 F.3d at 87.  It also asks whether the person was "directly and proximately" harmed by that conduct, that is, whether the conduct was the "but-for" cause of the harm.  See In re Rendon Galvis, 564 F.3d at 175.

       1.       Fisher House Connecticut

Fisher House Connecticut is a "victim" of Creed's fraudulent scheme, under the CVRA.  First, Creed's actions toward Fisher House Connecticut were clearly elements of his scheme to defraud.  Local 46, 568 F.3d at 87.  The first element of wire fraud, as identified above, is that there was a "scheme . . . to defraud, or for obtaining money . . . by false or fraudulent pretenses."  18 U.S.C. § 1343.  Creed intentionally created a scheme whereby he knowingly represented to Fisher House Connecticut and the individuals affiliated with it, such as its "voluntary chief operating officer," that he would solicit donations for the organization.  Gov'ts Mem. on Victims, Att. A.  In reality, of

14

course, Creed solicited funds not for the benefit of Fisher House Connecticut, but for his personal use. Had Creed not lied about his misuse of the donated funds, other individuals involved with the organization, such as the chief operating officer, likely would not have allowed Creed to maintain control of the organization's bank accounts. See id. ¶¶ 3, 10 (describing the affiant's appointment, by Creed, as chief operating officer of Fisher House Connecticut; explaining that the affiant "gained control of Friends' bank accounts to prevent Creed form withdrawing any additional funds" as quickly as possible after learning of the fraud). In other words, Creed's false representations to Fisher House Connecticut that the money in its accounts would be spent in support of its mission were "false or fraudulent pretenses" on which his "scheme . . . to defraud, or for obtaining money" functioned. 18 U.S.C. § 1343. His actions in making those false representations are clearly elements of the offense.

    In addition, Creed's actions were the direct cause of the harm to Fisher House Connecticut, from which Creed took over one million dollars. Creed's use of the interstate wires to take money from the Fisher House Connecticut account for his personal use, the third element of wire fraud, was the direct cause of Fisher House's loss of those funds. See Hall, 467 Fed. App'x. at 50 (concluding that the defendant's false representation that, for a fee, she would allow clients to "lease" money to prove their creditworthiness was the direct cause of the victim's loss of the money they gave her as "fees"); Jordan, 173 F. Supp. 3d at 56 (Jordan was clearly the victim of financial fraud because funds were illegally withdrawn from her banking accounts, by virtue of documents forged by her husband, without her consent). Therefore, Fisher House Connecticut should be considered a "victim" of Creed's wire fraud under the CVRA.

15

Further, the court concludes that Fisher House Connecticut is not a sham organization. Although there are similarities to the <u>Gonzalez</u> case on which the government relies in its Supplemental Memorandum, <u>see</u> Government's Supplemental Memorandum as to Victims (Doc. No. 36) (citing <u>United States v. Gonzalez</u>, 647 F.3d 41 (2d Cir. 2011)), the charity organizations in that case "did not engage in any substantial amount of not-for-profit activity," 647 F.3d at 44, but rather were "established specifically for the purpose of channeling donor and grant funds to Gonzalez for his personal use," <u>id.</u> at 64. Fisher House Connecticut donated over one million dollars—approximately 40% of the total funds raised—to Fisher House National. <u>See</u> Information ¶ 14; Government's Supplemental Memorandum as to Victims at 4. That substantial donation supported the mission of Fisher House Connecticut and is evidence that the organization is not a sham. While this case is close to <u>Gonzalez</u>, <u>Gonzalez</u> does not control it because of these differences. Thus, Fisher House Connecticut is a victim under the CVRA.

2.    Individuals and entities targeted through direct solicitation

As discussed above, numerous individuals and entities were defrauded by Creed's direct solicitation of donations to Fisher House and his false representation to them that the donations would be used solely for the benefit of Fisher House. This includes ShopRite, Wakefern, APK Charities, the Westbrook Elks, the Wallingford Lions club, the Fred Astaire dance studio, various American Legions, the Sons and Daughters of Italy, and any individual who made a donation to Creed as a result of person-to-person conversations / direct solicitation. It also includes individuals who were defrauded by the representations made on the Fisher House Connecticut website,

16

which Creed personally controlled.  Gov't Mem. on Victims, Att. A, ¶ 12.  Finally, it

includes individuals who participated in fundraisers coordinated by Creed or his agents

at Fisher House Connecticut, including the participants in the Fisher House Connecticut

10K and Half-Marathon and individuals who bought bricks from Creed.

These individuals were clearly harmed by Creed's extensive scheme to defraud

them by making false representations.  The scheme was that Creed would solicit

donations by falsely representing to each individual in this category that the money they

donated to Fisher House Connecticut would be used to support veterans and their

families.  Those false representations were critical to his scheme to defraud in order to

obtain money for his personal use.  Each time an individual, believing Creed's false

representations to be true, would donate money to Fisher House Connecticut, that

person was harmed by conduct that formed the offense.  Creed, who controlled the

money in the Fisher House Connecticut bank account, would then use it, at least in part,

to cover his personal expenses.  Thus, Creed's fraudulent misrepresentations to these

individuals are an element of wire fraud.

Further, Creed's actions were the "but-for" cause of the donations.  Creed directly

asked these individuals for donations and did so by misrepresenting the ultimate use of

those donations.  These individuals would not have donated to Fisher House

Connecticut had they not been told these false statements or seen the false

representations on the Fisher House Connecticut website.  The individuals who

participated in the events hosted by Fisher House Connecticut would not have donated

to participate had Creed not planned those events and misrepresented the ultimate use

of the donated funds.  Cf. Marino, 654 F.3d at 322 (reasoning that, had Marino not

17

concealed the Ponzi scheme, no investor would have invested in the scheme); <u>Hall</u>, 467 Fed. App'x. at 50 (concluding that the defendant's false representation that, for a fee, she would allow clients to "lease" money to prove their creditworthiness was the direct cause of the victim's loss of the money they gave her as "fees").

Therefore, any individual or entity from whom Creed obtained donations by making false representations that those donations would be used to support Fisher House Connecticut rather than go towards his personal expenses—including individuals solicited via personal contact, the website, or fundraisers planned by Creed or his agents—is a victim under the CVRA.

### 3.    Individuals and entities who donated through intermediaries

The third category of putative victims is those individuals who donated to participate in events hosted by others, where the donations were ultimately collected by the intermediary and given to Fisher House Connecticut.  In the court's view, individuals who donated to a charity that then donated to Creed are not "victims" under the CVRA.

Consider, for example, a dancer at the dance studio's fundraiser for veterans. Based on the allegations in the Information and the evidence before the court, Creed lied to the dance studio about the purpose of Fisher House Connecticut, and, but for the lies, the dance studio would not have hosted a fundraiser.  Therefore, the dance studio is clearly a "victim" under the CVRA.  However, it is not clear that Creed's misrepresentations were the but-for cause of any harm to dancers who participated in the event.  The court cannot say that but for Creed's misrepresentations, any given dancer would not have attended a fundraising dance hosted by the dance studio for charity.  The same is true of the individuals who ran a race with APK Charities.

18

Although the runners knew that APK is a charity that focused on veterans, their decision to run the race was informed by the event's connection to APK, not its links to Fisher House Connecticut.  Had Creed not lied to APK Charities, APK Charities might still have hosted a fundraising race, and the runners would still have participated—however, APK would not have donated the proceeds to Creed.  Therefore, Creed's actions are the "but-for" cause of the harm to APK Charities, but not to the runner.  In both cases, the court has no basis upon which to conclude that, but for Creed's misrepresentations, the dancer would not have danced or the runner would not have run.  Therefore, the dancer and the runner are not "victims" of Creed's fraudulent scheme.

Because Creed's representations are not the "but-for" cause of the harm to individuals who donated their money to an intermediary that ultimately passed the money on to Creed, those individual participants were not "directly and proximately" harmed by Creed's fraudulent scheme.  Because they were not directly and proximately harmed, these individual participants are not "victims" under the CVRA.  See Rendon Galvis, 564 F.3d at 175.  Finally, because the court concludes that the "direct and proximate" requirement is not met, it does not consider whether the second requirement of the CVRA's definition of "victim"—that the person be harmed "as a result of" the offense—was met with regard to individuals who donated through intermediaries that ultimately donated to Creed.

### 4.    Fisher House National and would-be beneficiaries

The court is sympathetic to the individuals and entities that would have benefitted from the funds solicited by Fisher House Connecticut, including Fisher House National and the veterans that would have used the services provided by Fisher House

Connecticut.  Clearly, they were deprived of benefits they should have received.

However, the court cannot conclude that the intended beneficiaries of the donations are

"victims" of Creed's scheme under the CVRA.  As discussed, in order the be considered

a victim, an individual must have been directly and proximately harmed as a result of

actions taken by Creed that were elements of his offense of conviction.  See Local 46,

568 F.3d at 87.

Regarding the veterans, even if the court assumes that the loss of a potential

benefit is a harm, in the court's view, that harm is too speculative to have been directly

and proximately caused by Creed's scheme to defraud.  Creed made no false

representations to these would-be beneficiaries; rather, he lied to donors about who the

would-be beneficiaries would be.  The scheme functioned because those lies induced

donors to give money to Fisher House Connecticut, which Creed then spent.  The

scheme was complete when Creed deprived Fisher House Connecticut of its funds; that

doing so also had the effect of depriving veterans of the benefit of those funds was not

an element of the wire fraud offense.  See Rendon Galvis, 564 F.3d at 175.

For similar reasons, the court concludes that Fisher House National is not a

victim of Creed's fraudulent scheme.  As discussed, Creed's scheme involved taking

funds earned by Fisher House Connecticut for his personal use.  That those funds could

have been donated to Fisher House National was not an element of Creed's scheme.

In order for the scheme to succeed, Creed needed to make false representations to

donors, obtain money based on those false representations for Fisher House

Connecticut, and then pillage that money from Fisher House Connecticut's accounts for

his own personal use.  Although the effect of the scheme was that Fisher House

20

Connecticut lost funds that it could have given to Fisher House National, that effect was not a direct and proximate harm caused by actions Creed took to implement his fraudulent scheme.  See Local 46, 568 F.3d at 87 (accepting the lower court's reasoning that, although the union lost fees it would have received had the defendant's scheme not worked, it was not a victim of the defendant's money laundering, because the crime "had already been committed by the time the cash was given to the union workers.")

For these reasons, the court concludes that Fisher House National and the veterans who could have benefited from funds are not "victims" entitled to the rights described in the CVRA.

5.    Conclusion

To summarize, the court has identified four categories of victims: (1) Fisher House Connecticut, (2) the individuals and entities from whom Creed or his agents solicited donations by making false representations, (3) the individuals and entities who donated to an intermediary that ultimately donated to Fisher House Connecticut, and (4) the would-be beneficiaries of funds donated to Fisher House Connecticut.  Of those four categories, in the court's view, only the individuals and entities in the first two categories are "victims" under the CVRA.  Therefore, individuals and entities in those first two categories are entitled to the rights protected by that statute, and the court must ensure that those rights are respected.

D.    Compliance with the CVRA

Having identified the categories of individuals it concludes are "victims" under the CVRA in this case, the court must address whether Creed's victims have had their

21

rights respected.  As Judge Meyer discussed in United States v. Stevens, 239 F. Supp. 3d 417 (D. Conn. 2017), the CVRA imposes no less than an affirmative duty on judges to ensure that victims' rights are respected.  Stevens, 239 F. Supp. 3d at 420.  Those rights include, inter alia, the right "to be informed in a timely manner of any plea bargain," the "right to be heard at any public proceeding in the district court involving . . . [the] plea," and "the reasonable right to confer with the attorney for the Government in the case."  18 U.S.C. § 3771.

In Stevens, the government did not confer with the mother of an individual who died of an overdose of heroin laced with fentanyl before entering a plea agreement with the defendant, who had sold the drugs.  Stevens, 239 F. Supp. 3d at 420-21.  The mother only learned of the plea agreement after the fact, from a victim-witness coordinator at the U.S. Attorney's Office; when she did, she expressed that she was upset with the leniency of the charge.  Id. at 421.  The court rejected the plea agreement because "the sound administration of justice does not support acceptance of a plea agreement when the Government does not respect the rights of crime victims." Id. at 425.  In that court's view, the CVRA's promise of a right to confer with the attorney for the government "must mean more than that a prosecutor need only answer phone calls or emails if a traumatized victim has the verve to initiate a conversation . . . about the case," and required "at the least that a prosecutor take reasonable steps to consult with a victim before making a prosecution decision that a prosecutor should reasonably know will compromise the wishes and interests of the victim."  Id. at 421-22.  Because the prosecution in that case had agreed to a lesser charge without consulting with the

victim's mother, the court concluded that "[t]he mother's and the family's rights and interests were not appropriately honored and respected." Id. at 423-24.

In this case, the government informed Judge Merriam at Creed's Initial Appearance that it had spoken with the lawyer for Friends of Fisher House Connecticut and with 28 of the 29 organizations that the FBI identified as having donated to Fisher House Connecticut, including the Fred Astaire Dance Studio and the Knights of Columbus. See Transcript (Doc. No. 16) at 11-15. Thus, it seems that the government complied with the CVRA at least with respect to the first category of "victims" discussed above—Fisher House Connecticut—and with respect to part of the second category of "victims." As discussed above, see supra at 16, the second category includes both entities and individuals from whom Creed, and his agents, directly solicited donations to Fisher House Connecticut.

Based on the submissions to date and the transcript of Creed's Initial Appearance, it is not clear whether all of the victims in the second category above—specifically, the individuals from whom Creed directly solicited donations to Fisher House Connecticut—have had their rights under the CVRA respected. Although the government represented that it contacted the entities from which Creed solicited donations, it did not state on the record before Judge Merriam whether it had contacted the individual people from whom Creed or his agents solicited donations personally, through the website, or through Fisher House Connecticut events.[7] In its Motion for

---

[7] The government did represent, before Judge Merriam, that it had not attempted to contact individuals who had given money to the dance studio, for example. Transcript (Doc. No. 16) at 12. Individuals who gave money to intermediaries that then donated the money to Creed are not victims under the CVRA, as discussed supra at 17-19.

Alternative Victim Notification (Doc. No. 30), the government represents that it has "sent out over 2,500 letters" to "the donors of Fisher House Connecticut." Mot. for Alternative Victim Notification at 1; see also id., Ex. A (letter dated October 11, 2019). The October 11 letter, included as Exhibit A, states that "Kevin Creed . . . pleaded guilty," implying that the plea agreement had already been signed and the defendant had entered a guilty plea (albeit it has not been accepted). Mot. for Alternative Victim Notification, Ex. A, at 1. The letter informed the recipients that they could speak at sentencing and quoted section 3771, but it did not specifically say that the recipient could speak to the government regarding the plea agreement. Id. at 2. Therefore, it remains unclear to whether (a) these 2,500 "donors of Fisher House Connecticut" represent all the individual people from whom Creed directly solicited donations and (b) whether those individuals were contacted before the plea agreement was signed and adequately informed of their right to be reasonably heard at any public proceeding involving that plea. 18 U.S.C. § 3771(a)(4). Because the court is not satisfied that all of the individuals who donated to Fisher House Connecticut have been adequately notified of their rights under the CVRA, including the rights to be heard at any proceeding regarding the plea and the reasonable right to confer with the government, the court will not accept the plea agreement at this time. The court will enter orders, see infra, to ensure these rights are honored.

The government has recently filed their Motion for Alternative Victim Notification pursuant to section 3771(d)(2) of title 18 of the United States Code. See Mot. for Alternative Victim Notification (Doc. No. 30). That section requires this court to "fashion a reasonable procedure to give effect to this chapter that does not unduly complicate or

prolong the proceedings" if the court finds that "the number of crime victims makes it impracticable to accord all of the crime victims the rights described."  18 U.S.C.A. § 3771.  The government seeks to use alternative methods, such as press releases and a website, to notify victims.  Mot. for Alternative Victim Notification at 5.  Based on the number of victims in this case, the court finds that "the number of crime victims makes it impracticable to accord all of the crime victims the rights" in the CVRA.  The court agrees that the government's proposal to notify the victims through a combination of press releases, websites, and use of the government's Victim Notification System is a "a reasonable procedure to give effect to" the CVRA.  18 U.S.C.A. § 3771.

## III.    CONCLUSION

For the reasons discussed above, the court concludes that Fisher House Connecticut and any individual or entity that was targeted through direct solicitations that relied on false representations by Creed—including through person-to-person solicitation, online media, or fundraisers planned by Creed or his staff for the benefit of Fisher House Connecticut—is a "victim" under the CVRA.  It concludes that any individual who participated in an event coordinated by another organization or individual, such as the runners in the APK Charities races, is not a victim, because that individual was not directly and proximately harmed by Creed's fraudulent scheme.  The court also concludes that Fisher House National and the veterans who may have benefited from the pilfered funds are not "victims," as that phrase is defined in the CVRA, of Creed's wire fraud.

**ORDERS**

The court enters the following Orders:

(1)      The government and the defendant will have **SEVEN (7)** days from the issuance of this Order to identify any misstatement of fact that was relied on by the court in reaching its conclusions; to take exception to the categories identified, supra at 12-14; and to address the court's designation of various individuals and Fisher House National as not "victims" in this case, supra at 17-20.

(2)      Within **FOURTEEN (14)** days of the issuance of this Order, the court will issue a Notice or further Order indicating if it intends to alter the categories of "victims" or its designation of certain categories as not a "victim" in this case.

(3)      Based on the final categories identified, the government is directed to provide the required notification to persons and entities in categories determined to be "victims" in this case within **FOURTEEN (14)** days of the court's action in paragraph 2 supra.  The court **GRANTS** the government's Motion for Alternative Notification (Doc. No. 30) for victims who are too numerous to be notified.  Any Notice issued through the websites, press releases, or the Victim Notification System will clearly state that the victims are entitled, pursuant to section 3771(a) of title 18 of the United States Code, to be reasonably heard at any public proceeding involving the plea agreement and to confer with the attorney for the government.  The Notice will also state that the court has not yet accepted the plea agreement.  The government will file a report, within **FOURTEEN (14)** days of the court's action in paragraph 2 supra, with the court certifying that the notification has been made in compliance with this Order and the Crime Victims' Rights Act.

26

(4)    The court will schedule a hearing on the plea agreement approximately fourteen days after notice per paragraph 3 supra.  A calendar notice will issue.  If the defendant intends to withdraw his plea, the court requests that he notify it and the government of his intent to do so as soon as possible, but recognizes that the defendant has the right to withdraw his plea agreement at any time before the court accepts it, pursuant to Federal Rule of Criminal Procedure 11(d)(1).  The court directs the government to provide notice of the hearing on the plea agreement to any individual identified as a "victim."

(5)    In light of this Ruling, the court orders that the parties brief the issue of which victims are entitled to receive restitution and, given that some victims suffered loss of the same dollar, what the government and the defendant propose to avoid double payment by Creed.  The government's memorandum is to be filed by January 17, 2020.  The defendant's memorandum is to be filed by January 31, 2020. Sentencing has been rescheduled to March 16, 2020.

**SO ORDERED.**

Dated this 15th day of November, 2019, at New Haven, Connecticut.


/s/ Janet C. Hall
Janet C. Hall
U.S. District Judge